IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION

PEGGY LEE WARD,                         :        Case No. 3:12-CV-01357

    Plaintiff,                          :

      vs.                              :

COMMISSIONER OF SOCIAL SECURITY,        :        MAGISTRATE'S REPORT AND
                                                 RECOMMENDATION
    Defendant.                          :

## I. INTRODUCTION.

This case was referred to undersigned Magistrate for report and recommendation.  Pursuant to

42 U. S. C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying her

claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act).  Pending

are the Briefs of the parties and Plaintiff's Reply (Docket Nos. 17, 19 & 21).  For the reasons set forth

below, the Magistrate recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On September 29, 2008, Plaintiff completed an application for DIB, alleging that she became

unable to work because of her disabling condition on June 15, 2006 (Docket No. 11, pp. 130-131 of

882).  The application for DIB was denied initially and upon reconsideration (Docket No. 11, pp. 67-69;

72-74 of 882).  At the hearing conducted before Administrative Law Judge (ALJ) Marlene W. Heiser, Plaintiff, represented by counsel, appeared and testified (Docket No. 11, pp. 34, 36 of 882)  On May 21, 2010, the ALJ rendered an unfavorable decision, finding that Plaintiff was not entitled to a period of disability and DIB (Docket No. 11, pp. 19-29 of 882).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on March 28, 2012 (Docket No. 11 pp. 4-6 of 882).  Plaintiff filed a timely Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

### III. FACTUAL BACKGROUND.

On April 28, 2010, the administrative hearing was held by teleconference in Hartford, Connecticut with Plaintiff and counsel appearing in Ohio.  To establish that she became disabled before her date last insured (DLI) of June 30, 2007, Plaintiff presented the following evidence.

In 2007, Plaintiff was 54 years old.  She was 5'4" and her approximate weight was between 140 and 150 pounds.  As a high school graduate, Plaintiff  could read and write but she had difficulty writing well with her right hand after her strokes in 2008.  Plaintiff was married; however, she and her husband had no children.  As the primary manager of their home, Plaintiff cleaned, cooked, dusted if no bending was involved, did the laundry and drove at least once weekly to do grocery shopping (Docket No. 11, pp. 44, 50, 56 of 882).  Plaintiff had a long history of fibromyalgia which she described as arthritic-like pain in her entire body, even in her buttocks and back.  She claimed that two of the symptoms of fibromyalgia were fatigue and insomnia.  Although the onset of the symptoms was intermittent, Plaintiff advised that she experienced them at least once weekly.  The symptoms were more pronounced when the seasons changed from winter to spring and fall to winter (Docket No. 11, pp. 46, 47, 53 of 882).

2

Plaintiff had inflamed nerves in her feet that caused her to walk with a limp since 1990 (Docket No. 11, p. 46 of 882).  In 2007, Plaintiff could walk for ten minutes, rest and then resume walking; stand for ten minutes, and sit for two hours with an option to stand after two hours had elapsed; and lift and carry up to ten pounds (Docket No. 11, pp. 48, 49 of 882).

Plaintiff was prescribed Celebrex®, a non-steroidal anti-inflammatory drug, which she had taken for an extended period of time.  On a scale of one to ten, with one being very little and ten being the most severe, her pain was a ten without medication.  The medication reduced her pain level to five.  However, her physician decreased use of the drug to reduce the risks of adverse side effects (Docket No. 11, pp.47-48 of 882 PHYSICIAN'S DESK REFERENCE, 2006 WL 389819 (2006)).

After valve surgery in 2005, Plaintiff was prescribed Coumadin therapy.  Coumadin is an anticoagulant which acts by inhibiting vitamin K-dependent coagulation factors.  Plaintiff continued to suffer from chronic fatigue, a symptom of fibromyalgia, but not nearly of the severity that she had before the surgery.  Then in preparation for foot surgery, Plaintiff was taken off Coumadin.  Almost immediately she had a stroke which resulted in partial paralysis of her right hand.  At the time of the hearing, Plaintiff was learning to regain use of her right hand (Docket No. 11, pp. 44, 52, 53, 57 of 882; PHYSICIAN'S DESK REFERENCE, 2006 WL 367849 (2006)).

Plaintiff was diagnosed with borderline diabetes after 2007 (Docket No. 11, p. 55 of 882).

Plaintiff had been employed outside of the home at Homes Unlimited, Kirchers Flowers and a plastics factory.  As a sales person at Homes Unlimited, Plaintiff had difficulty staging the mobile homes in contemplation of sale or walking across decorative stones.  The owner of Kirchers accommodated Plaintiff's condition, permitting her to sit when needed.  Plaintiff quit her job at the plastics factory because of the symptoms associated with fibromyalgia, specifically, inflamed nerves

that caused pain in her feet and bunions.  These problems with her feet made it difficult to ambulate and stand on the concrete floor (Docket No. 11, pp. 45-46, 49, 50, 58, 59 of 882).

## IV. MEDICAL EVIDENCE.

Under the Title II program, medical evidence is the cornerstone for the determination of disability.  Each person who files a disability claim is responsible for providing medical evidence showing that he or she has an impairment and the severity of that impairment.  20 C. F. R. § 404.1512(c) (Thomson Reuters 2012).  The medical evidence generally comes from sources who have treated or evaluated the claimant for his or her impairment.  20 C. F. R. § 404.1512(b) (Thomson Reuters 2012).  A chronological review of the sources who have treated and/or evaluated Plaintiff prior to the expiration of DLI or June 30, 2007, follows

Here is a listing of Plaintiff's hospitalizations and surgeries occurring before the expiration of the DLI:

| | | |
|---|---|---|
| 1. | Tubal ligation | 1974 |
| 2. | Tubal reconstruction | 1981 |
| 3. | Neuroma x4 and bunion surgery | 1990 |
| 4. | Left index finger repaired | 1994 |
| 5. | Laparoscopic cholecystectomy | 1990s |

(Docket No. 11, pp. 196, 198 of 882).

On November 11, 1993, Dr. Samuel M. Neuschwanger, D. P.M., was consulted about right foot pain in the fifth metatarsal.  Dr. Neuschwanger treated the pain with a corticosteroid injection (Docket No. 11, pp. 696-697 of 882).  On November 18, 1993, Plaintiff's right foot pain was improved (Docket No. 11, p. 694 of 882).

On December 9, 1993, Plaintiff underwent an excision of the neuroma on the right foot and a surgical procedure to excise a bunion on the left foot (Docket No 11, pp. 690-693 of 882).  Two weeks

4

later, there was some swelling and other discomfort which Dr. Neuschwanger assured Plaintiff was normal (Docket No. 11, p. 689 of 882).  On December 30, 1993, Plaintiff underwent surgery whereby bone was cut to change the alignment of the fifth left metatarsal (Docket No. 11, p. 688 of 882).

Plaintiff was referred to a physical therapist on January 17, 1994 to complete a plan for decreased pain (Docket No. 11, p. 685 of 882).  By February 3, 1994, she reported that physical therapy was no longer providing her any relief.  After eight visits with the physical therapist, Plaintiff was able to ambulate wearing shoes and the range of motion bilaterally was well within normal limits (Docket No. 11, pp. 682, 683 of 882).  On February 24, 1994, Plaintiff reported to Dr. Neuschwanger that her left foot was essentially pain free (Docket No. 11, p. 681 of 882).

On April 4, 1994, Dr. James H. Gray, D. O., an attending physician at the Paulding County Hospital, referred Plaintiff, to Dr. Steven Cremer, M. D., to determine the source of her right foot pain (Docket No. 11, p. 680 of 882).

Dr. Robert McNutt, M. D., conducted a consultation with Plaintiff on November 29, 1994, diagnosing her with fibromyalgia, arthralgia, mild adhesive inflammation of the right shoulder and mild bilateral inflammation of the bursa.  An anti-inflammatory medication and steroid, in short course, were prescribed with a plan to return in two weeks for an electrocardiogram (EKG) (Docket No. 11, pp. 643-645 of 882).

Dr. Neuschwanger diagnosed Plaintiff with chronic bilateral metatarsalgia on January 12, 1995 (Docket No. 11, p. 679 of 882).  During the following week, he prescribed orthotics (Docket No. 11, p. 678 of 882).  Then on March 9, 1995, Dr. Neuschwanger excised a neuroma of the third intermetatarsal-web space of the right foot and a mass-neuroma of the fifth metatarsophalangeal joint of the right foot (Docket No. 11, pp. 671-672 of 882).  The dressing was removed on March 11, 1995

and Dr. Neuschwanger noted that Plaintiff was recovering well (Docket No. 11, pp. 667-668 of 882).

Six weeks from the surgery, she continued to do well (Docket No. 11, p. 661 of 882).  Referred to

physical therapy on June 19, 1995, Plaintiff was having minimal complaints of pain or discomfort when

discharged on July 13, 1995 (Docket No. 11, pp. 653, 656-657 of 882).  Plaintiff complained of severe

foot pain and on September 21, 1995, Dr. Neuschwanger suggested that she file for social security

benefits (Docket No. 11, p. 649 of 882).

Dr. Neuschwanger prescribed Lamisil tablets to treat ringworm on the nail of Plaintiff's left

great toe on June 17, 2004.  Upon examination, the Lamisil treatment was continued and in addition,

Dr. Neuschwanger noted that Plaintiff had developed painful hyperkeratosis of the plantar aspect of the

right foot on August 26, 2004.  On October 28, 2004, Dr. Neuschwanger debrided the hyperkeratosis

of the plantar aspect (Docket No. 11, pp. 446-448 of 882).

On December 14, 2001, Dr. Gray requested that Dr. Robert E. Swint, Sr., M.D., a cardiologist,

conduct a consultation to assess the status of Plaintiff's rheumatic valve disease with mild mitral valve

stenosis and moderate aortic valve stenosis (Docket No. 11, pp. 353 of 882).  Thereafter Dr. Swint

consulted with Plaintiff on December 10, 2002, confirming that there was no evidence of significant

cardiac insufficiency (Docket No. 11, p. 353 of 882).  On February 4, 2004, Dr. Swint indicated that

Plaintiff's gradients had not changed so further study was in order.  At that point, Dr. Swint was

convinced that Plaintiff would need a double valve replacement within the next five to ten years

(Docket No. 11, pp. 346 of 882).

Plaintiff established a new patient relationship with Dr. Tricia Vandehey, D.O, a family

practitioner, on September 8, 2004.  After conducting a clinical interview and reviewing old medical

records, Dr. Vandehey ordered diagnostic tests, started her on Celebrex, ordered a Pap test, a

6

mammogram and a dual energy X-ray absorptiometry (DEXA scan), a test used to measure bone mineral density (Docket No. 11, p. 239 of 882; www.dexascan.net).

On September 30, 2004, Plaintiff presented to Dr. Vandehey with her chief complaints being a lump on her nose, headaches and a lesion on her back.  Dr. Vandehey diagnosed Plaintiff with a cystic swelling to the right nasal bridge; benign skin lesions on her back, possibly seborrheic keratoses, a noncancerous benign skin growth that originates in the keratinocytes; headaches probably from increasing ocular pressure and osteoarthritis.  She injected Kenalog, a medication used to treat inflammation caused by allergic reactions, into the lesion, ordered a complete blood count and comprehensive metabolic panel and continued Plaintiff on Celebrex.  Plaintiff weighed 138.0 pounds (Docket No. 11, pp. 238, 239 of 882; STEDMAN'S MEDICAL DICTIONARY, PHYSICIAN'S DESK REFERENCE

Also, on September 30, 2004, a specimen was collected during a routine gynecological examination.  There was no evidence of intraepithelial lesion or malignancy (Docket No. 11, p. 295 of 882).  When the results from the bilateral mammogram taken on September 30, 2004 were compared with similar tests from 2002, there was evidence of new density in the upper outer quadrant of the left breast with benign features.  Further ultrasound was recommended (Docket No. 11, p. 311 of 822).

Plaintiff was referred for evaluation of an abnormal mammogram and on October 27, 2004, Dr. Jeffrey A. Pruitt, M. D., determined that based on the Breast Imaging-Reporting and Data System's (BIRADS) rating, there was very low suspicion of malignancy.  He advised Plaintiff to continue routine self examination, continue annual mammography and quit smoking (Docket No. 11, pp. 242 of 882; www.hopkinsmedicine.org).

Plaintiff presented to the Defiance Clinic for a routine glaucoma evaluation and on November 17, 2004, she was prescribed an eye bath and advised to refrain from using contact lenses which was

probably the source of the acute conjunctivitis (Docket No. 11, p. 249 of 882).

On December 2, 2004, a nodule was detected on Plaintiff's left lobe during a lung scan administered while an issue with conjunctivitis was resolved (Docket No. 11, pp. 234, 247 of 882).

The CT scan of Plaintiff's chest taken on January 7, 2005, showed a stable small pulmonary nodule in the left lower lung field (Docket No. 11, p. 308 of 882).

Dr. Swint suspected that Plaintiff had become symptomatic because her red blood cell distribution exceeded the normal range.  He ordered a heart catheteriziation (cath.) during the week following January 19, 2005.  Based on Mayo Clinic studies, Plaintiff's medical records and the results from the cath., Dr. Swint commented that it was time to consider replacing the valve (Docket No. 11, pp. 336-339, 365 of 882).

From a sample of blood drawn on January 25, 2005, Plaintiff's sodium level was slightly lower than the acceptable reference range.  The white blood cell count was elevated outside the acceptable reference range (Docket No. 11, pp. 364 of 882).

The right side of Plaintiff's face showed swollen glands, her eyes were dry and she was suffering from pressure headaches on January 28, 2005.  At that time she weighed 147.4 pounds.  Dr. Sanjiv G. Aggarwal M. D., a cardiologist, ordered a complete blood count and an electrolyte profile (Docket No. 11, p. 232 of 882).

A preoperative transesophageal EKG was conducted on April 13, 2004.  The results showed that the left atrium was at the upper limits of normal and the left atrial appendage did not have any thrombus and moderate aortic valve sclerosis with calcification leading to severe aortic stenosis and trace aortic regurgitation (Docket No. 11, pp. 355-356 of 882).

Dr. Aggarwal performed a right and left heart cath. on February 2, 2005.  The results from the

8

cath. lab procedure showed severe aortic stenosis.  Dr. Aggarwal recommended continued aggressive therapy (Docket No. 11, pp. 357-359 of 882).

Plaintiff underwent a colonoscopy on March 24, 2005.  It was confirmed that she had left-sided diverticulosis, small internal hemorrhoids but no evidence of inflammatory or neoplastic disease (Docket No. 11, pp. 361-362 of 882).

On April 13, 2005, Plaintiff underwent surgery during which the mitral valve was resectioned, the aortic valve was replaced and there was a root replacement of the ascending aorta (Docket No. 11, pp. 377-378 of 882).

Dr. Jonathan Philpot, M. D., conducted a consultative examination on April 17, 2005, after which he suggested that Plaintiff had status post aortic and mitral valve replacement with improving conduction system.  It was recommended that Plaintiff continue cardiac rehabilitation (Docket No. 11, pp. 408-409 of 882)

Plaintiff entered a cardiac rehabilitation program on April 26, 2005.  Therapy included maintaining adequate blood pressure, monitoring deep venous thrombosis prophylaxis, swallowing, physical therapy, speech therapy and occupational therapy (Docket No. 11, pp. 399-404 of 882).

On July 15, 2005, Plaintiff was three months post double valve replacement and aortic root replacement.  She was progressing well according to Dr. Swint.  There was no dizziness, tachycardia, palpations or syncope (Docket No. 11, p. 329 of 882).

Approximately two months after having open heart surgery on May 4, 2005, Plaintiff had a runny nose and sore throat.  Dr. Vandehey prescribed Tylenol, Robitussin® and Claritin®, for consumption individually or in combination with each other.  Plaintiff weighed 148.2 pounds (Docket No. 11, pp. 230, 231 of 882).

She unsuccessfully attempted to resolve the cough with over-the-counter lozenges, so on June 15, 2005, she presented to Urgent Care, complaining of a cough that had been present for four days. Plaintiff was diagnosed with bilateral maxillary sinusitis and prescribed medication used by healthcare professionals to treat bacterial infections and a pain reliever (Docket No. 11, p. 228 of 882).

Plaintiff was diagnosed with borderline glaucoma on October 18, 2005 (Docket No. 11, pp. 244 of 882).  On the same date, Plaintiff underwent a gynecologic examination and the specimen tested negative for intraepithelial lesion or malignancy (Docket No. 11, p. 294 of 882).

On November 5, 2005, Plaintiff tripped over a pile of wood, suffering a laceration to her scalp. She presented to Dr. Vandehey on November 16, 2005, for removal of the sutures and staples from her scalp wound (Docket No. 11, p. 223 of 882).

Plaintiff presented to Dr. Vandehey with a sore throat, swollen glands, cough and congestion. Diagnosed with acute pharyngitis, Dr. Vandehey prescribed antibiotic therapy on November 25, 2005 (Docket No. 11, p. 221 of 882).

On December 16, 2005, the EKG showed that the aortic and mitral prosthetic valves were well functioning (Docket No. 11, p. 389 of 882).

Dr. Swint saw Plaintiff on December 22, 2005, noting that she had done well, her echocardiogram had demonstrated normal functioning and except for the one episode of chest discomfort after overexerting herself.  Plaintiff weighed 164 pounds (Docket No. 11, p. 326 of 882).

On May 12, 2006, Plaintiff discussed with Dr. Vandehey her medication intake, left finger pain, lump in vagina and lump in her fifth toe.  She noted that the therapy of Prilosec and Nexium had failed in controlling the gastrointestinal reflux disease symptoms; therefore,  new medication–Protonix–was prescribed.  There was no evidence of fracture or dislocation in the left middle phalanx.  Plaintiff was

10

prescribed medication used to treat infections and instructed to use ice and anti-inflammatories as needed (Docket No. 11, pp. 216, 305 of 882).

On November 3, 2008, Dr. Bonnie Katz, Ph. D., performed a psychiatric review for the period of "June 15, 2006 through June 30, 2006."  During this time, Plaintiff had coexisting, non-mental impairments that required referral to another medical specialty.  Dr. Katz opined that there was insufficient evidence to determine the extent of functional limitations, if any, on Plaintiff's activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace (Docket No. 11, pp. 422-432 of 882).

On November 24, 2008, Dr. Lynne Torello, M. D, assessed Plaintiff's physical residual functional capacity (RFC) for a period ending on June 30, 2006.  She made the following findings:

1.  Plaintiff could occasionally lift and/or carry fifty pounds.
2.  Plaintiff could frequently lift and/or carry twenty-five pounds.
3.  Plaintiff could stand and/or walk for a total of about six hours in an eight-hour workday.
4.  Plaintiff could sit about six hours in an eight-hour workday.
5.  Plaintiff could push and/or pull on an unlimited basis.
6.  Plaintiff had no postural, manipulative, visual, communicative or environmental limitations.

(Docket No. 11, pp. 436-443 of 882).

On February 21, 2009, Dr. W. Jerry McCloud affirmed the RFC of November 24, 2008 commenting:  "There is no new medical since the prior decision that would alter the 11/24/08 RFC" (Docket No. 11, p. 445).

Blood drawn and collected on August 30, 2006, September 29, 2006, November 8, 2006, January 4, 2007, March 22, 2007, June 15, 2007 and June 22, 2007, showed prothrombin time tests (PTT) results that were above the normal range.  PTT is a blood test that measures how long it takes for blood to clot.  The test can be used to screen for bleeding abnormalities (Docket No. 11, pp. 273, 274, 278, 279, 280, 281, 284 of 822; STEDMAN'S MEDICAL DICTIONARY)).

The echocardiography report dated December 11, 2006, showed that the prosthetic aortic and mitral valve functioning well (Docket No. 11, p. 387 of 882).

Dr. Swint ordered a 24-hour Holter monitor, a machine that measures and records the heart's rhythms, to begin on December 29, 2006 (Docket No. 11, p. 209 of 882). Dr. Swint contacted Dr. Vandehey to advise that he had referred Plaintiff to urgent care for possible deep vein thrombosis (DVT).  Plaintiff did not respond to Dr. Vandehey's attempts to contact her (Docket No. 11, p. 211 of 882).

Plaintiff became concerned when her left leg was swollen and causing pain.  The venous Doppler examination showed no evidence of DVT in the left lower extremity (Docket No. 11, p. 394 of 882).

The Holter monitor was applied again on January 4, 2007, to assess complaints of dizziness and its relevance to the mechanical valve (Docket No. 11, p. 210 of 882).

On January 5, 2007, Dr. William M. Finerty, Jr., D.P.M, found a neuroma of the left foot, mildly deformed nails of both feet and deformed fifth digit of the right foot (Docket No. 11, p. 241 of 882).

The chest X-ray taken on January 7, 2007 was compared with the image taken on January 7, 2005.  The results showed no evidence of pulmonary nodules and stable ectatic 4.2 cm ascending thoracic aorta (Docket No. 11, p. 303 of 882).

After Plaintiff reported having a sore throat for three days, Karen Westhoven, P.A.C., ordered a two-day throat culture.  The EKG administered on March 22, 2007, showed a normal sinus rhythm but poor wave progression.  Plaintiff weighed 168 pounds (Docket No. 11, p. 206 of 882).

### V.  LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

12

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).       To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities."  *Id.*  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of*

*Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI.  THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings:

1.  At step one, Plaintiff last met the insured status requirements of the Act on June 30, 2007.  Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of June 15, 2006 through the DLI of June 30, 2007.
2.  At step two, through the DLI, Plaintiff had severe impairments, namely, vascular heart disease, status-post aortic and mitral valve replacements and foot neuroma.
3.  At step three, through the DLI, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.
4.  At step four, through the DLI, Plaintiff had the RFC to perform a full range of light work.
5.  At step five, through the DLI there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.
6.  In conclusion, based on Plaintiff's RFC for light work, age, education and work experience, a finding of "not disabled' is directed by the Medical Vocational Rule 202.13.  Plaintiff was not under a disability, as defined in the Act, at any time from June 15, 2006, the alleged onset date through June 30, 2007, the DLI.

(Docket No. 13, pp. 22-29 of 731).

## VII.  STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*.  *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).  "Substantial

14

evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Further, a district court must not focus, or base its decision, on a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)). In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)). Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

### VIII. PLAINTIFF'S CLAIMS.

Plaintiff seeks reversal and remand for the reasons that:

1. The ALJ improperly rejected the opinions of Dr. Miller, a treating source, and Dr. Torello, a state agency medical consultant, and substituted her own lay opinion in assessing Plaintiff's RFC.
2. The ALJ failed to properly analyze and consider the impact of Plaintiff's obesity in accordance with SSR 02-1p, rendering the Commissioner's decision not based on substantial evidence.
3. The ALJ failed to accurately evaluate Plaintiff's pain, including her medication use history.

## IX. Defendant's Response.

Defendant contends that:

1. Substantial evidence supports the ALJ's RFC finding.
2. The ALJ properly weighed the medical opinions of the record.
3. Substantial evidence supports the ALJ's credibility analysis.
4. The ALJ was not required to consider Plaintiff's obesity in her decision because Plaintiff failed to allege obesity.

## X. Analysis

1. **Whether Substantial evidence supports the ALJ's finding that Plaintiff can do a full range of light work.**

Plaintiff's first argument is multi-faceted.   First, the ALJ's finding that Plaintiff has the RFC for a full range of light work is based on her own opinions and flawed for the reasons that (1) the state agency physician, Dr. Torello, failed to articulate findings material to the determination of disability; (2) the use of the Medical Vocational Guidelines was illegal and the testimony of a VE was in order; and (3) the ALJ's RFC fails to reflect consideration of Plaintiff's foot problems and the effect that such problems have on her ability to work.

Second, the ALJ's decision should be remanded so that (1) Dr. Torello can consider the entire period prior to the DLI and render an updated decision as to Plaintiff's RFC and (2) Dr. Miller can clarify Plaintiff's RFC prior to the expiration of the DLI.

16

### DR. TORELLO, STATE AGENCY MEDICAL CONSULTANT.

The evidence shows that Dr. Torello's RFC assessment lists June 30, 2006 as the DLI and that the ALJ considered Dr. Torello's report.  However, Dr. Torello's report does not cite the medical evidence that she relied upon in completing her assessment.  Plaintiff contends that Dr. Torello's report is incomplete because she failed to consider any evidence of treatment occurring after June 30, 2006, a year prior to Plaintiff's DLI.

### STANDARD OF REVIEW FOR STATE AGENCY REPORTS.

Under 20 C. F. R. §§ 404.1527(f) and 416.927(f), ALJs are required to consider findings of fact by State agency medical and psychological consultants and other program physicians and psychologists about the existence and severity of an individual's impairment(s), including the existence and severity of any symptoms, as opinions of nonexamining physicians and psychologists.  TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS:  ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS  Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *8 (July 2, 1996).  ALJs and the Appeals Council are not bound by any State agency findings, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.  *Id.*

The opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion  . . . , the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.  *May v. Astrue,* 2012 WL 1203595, *3 (S.D.Ohio,2012).  The adjudicator must also

17

consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant. *Id.*

### APPLICATION OF THE LAW TO PLAINTIFF'S CASE.

In the instant case, the ALJ analyzed the State agency medical consultant and stated:

> I considered the residual functional capacity assessment provided by the State agency medical consultant Dr. Lynne Torello, dated November 24, 2008. Dr. Torello opined that during the relevant period the claimant was capable of performing medium work. That is, occasionally lifting/carrying up to 50 pounds and frequent lifting/carrying up to 25 pounds; standing or walking for about six hours in an eight-hour workday and sitting for about six hours in an eight-hour workday. I am giving the claimant the benefit of the doubt that she should [sic] could not regularly lift the weight involved in medium work in light of her occasional foot pain. Therefore, I give this opinion little weight.

Based on a careful review of the administrative record, the Magistrate concurs that Dr. Torello's conclusions for RFC were made without the benefit of relevant medical evidence relating back to Plaintiff's limitations prior to the crucial date that her insured status expired. Even so, the ALJ did not rely on that evaluation and instead, rejected Dr. Torello's conclusion that Plaintiff had the RFC sufficient for the performance of medium work. Plaintiff's argument is wholly without merit based solely on the fact that the ALJ rejected Dr. Torello's conclusion that Plaintiff has the RFC appropriate for medium work.

### THE USE OF A VOCATIONAL EXPERT.

Plaintiff asserts that the ALJ's vocational findings were erroneous because the ALJ did not incorporate her pain derived from these impairments in a hypothetical question to the VE and instead relied upon the GRIDS to render an opinion.

### THE STANDARD OF REVIEW FOR USE OF THE GRID.

Once an ALJ has determined a plaintiff cannot perform her past relevant work, the burden shifts

18

to the Commissioner at step five to show that there are other jobs in significant numbers in the economy the plaintiff can perform, consistent with her residual functional, age, education, and work experience. *Anthony v. Commissioner of Social Security*, 2012 WL 4483790, *25 (N.D.Ohio,2012) (*citing Cole v. Secretary of Health & Human Services*, 820 F.2d 768, 771 (6th Cir.1987)).  The Commissioner may meet this burden by reference to the GRIDS, unless the plaintiff suffers non-exertional limitations that significantly limit the range of work permitted by her exertional limitations. *Id.* (*See also Kimbrough v. Secretary of Health & Human Services*, 801 F.2d 794, 796 (6th Cir.1986)). If a plaintiff has exertional and non-exertional impairments, the ALJ cannot rely solely on the GRIDS. *Id.* (*citing Santilli v. Astrue*, 2012 WL 609382, *3 (N.D.Ohio 2012)).

The non-exertional limitations must be taken into account and a non-guidelines determination must be made when the non-exertional limitation restricts a claimant's performance of a full range of work at the appropriate RFC level.  *Id.* (*citing Kimbrough*, 801 F.2d at 796 (emphasis in original) (*quoting Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 528 (6th Cir.1981)). Therefore, a plaintiff "must show an impairment that significantly impairs [her] ability to do a full range of work at a designated level." *Id.*

When a plaintiff's non-exertional limitations do prevent her from performing the full range of work at a designated level—for example, the "light work" level, which the ALJ designated for Plaintiff here—then the ALJ must come forward with some reliable evidence showing there remain a significant number of jobs the plaintiff can perform, taking into account exertional and non-exertional limitations. *Id.* (*citing Santilli*, 2012 WL 609382, at *4).  In the absence of reliable evidence showing that non-exertional limitations do not significantly erode the occupational base at the plaintiff's designated level, the ALJ may not rely on the grids. *Id.* (*See Boley v. Astrue*, 2012 WL 680393, *9 (E.D.Mich.2012)

(*citing Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir.1987)).

### THE STANDARD OF REVIEW APPLIED TO PLAINTIFF'S CASE.

Plaintiff testified that she had fibromyalgia as early as 1995.  In November 1994, Dr. McNutt conducted a consultation with Plaintiff and diagnosed her with fibromyalgia.  The ALJ did not consider this a medically determinable impairment.   During treatment after DLI, Dr. Miller included fibromyalgia in the list of impairments; however, there is no reliable evidence showing the treatment of the symptoms arising from this diagnosis prior to or after the expiration of the DLI or that the symptoms restricted her performance of a full range of work at the light level of work. (Docket No. 11, p. 24 of 882).

Contrary to Plaintiff's argument, the record is not saturated with evidence that would persuade the ALJ that the limitations brought about by her foot treatment significantly limited the range of work permitted by her exertional limitations prior to the expiration of the DLI.  Plaintiff underwent an ostectomy of the left fifth metatarsal and excision of a neuroma intermetatarsal web space of the right foot in December 1993.  Thereafter, Plaintiff underwent intense treatment, seeing Dr. Neuschwanger on the average of twice a month after the operations.  Dr. Neuschwanger inserted an orthopedic pin to correct the fracture in the fifth metatarsal and a Kirschner wire in the fifth right metatarsal without complications.  Plaintiff had a bunion removed and several neuromas excised from the right foot. Responding well to physical therapy and the use of orthotics, in February 1994, Plaintiff had minimal discomfort except for burning sensation after standing and a calcaneal spur of soft tissue abnormality (Docket No. 11, pp. 646-656; 659-679; 681-697 of 882).  Ten years later on October 28, 2004, Plaintiff underwent a debridement of the plantar aspect of her right foot after using pills to treat onychomycosis for two months (Docket No. 11, p. 446 of 882).  Then on May 12, 2006, Dr. Vandehey treated Plaintiff

20

for an inflammatory nodule on the left toe with anti-inflammatory medication and the application of ice.  Plaintiff declined a referral to a podiatrist (Docket No. 11, p. 216 of 882).  Dr. Vandehey presumed that the left foot pain she complained of on December 13, 2006, resembled inflammation of a tendon.  Again Plaintiff declined referral to a podiatrist (Docket No. 11, p. 211 of 882).

On January 5, 2007, Dr. Finerty conducted a consultative examination during which a discussion occurred with Plaintiff as to the need to have the neuroma removed "some day."  Plaintiff reported that the mildly deformed nails of both feet and the deformed fifth digit on the right foot did not bother her "that much" (Docket No. 11, p. 241 of 882).

If the non-exertional limitation restricts a claimant's performance for a full range of work at the appropriate RFC level, non-exertional limitations must be taken into account and a nonguideline determination made.  In the instant case, the Magistrate is not persuaded that the medical evidence supports the non-exertional nature of Plaintiff's foot impairments or that it rises to the level of a non-exertional impairment.  Assuming *arguendo* that Plaintiff's foot impairment rose to the level of a non-exertional impairment, the medical record is devoid of reliable evidence that demonstrates an impairment that significantly limited the ability to do a full range of work at any level.  The mere possibility of a non-exertional impairment is insufficient to preclude application of the GRID.  The ALJ made no specific finding with respect to Plaintiff's alleged non-exertional impairments; however, the application of the GRID was appropriate when Plaintiff failed to show non-exertional limitations that were severe enough to prevent a wide range of gainful employment at the designated level.

The decision to use the GRID is supported by substantial evidence; accordingly, the ALJ employed the proper legal standard as promulgated by the regulations.

### DOES SUBSTANTIAL EVIDENCE SUPPORT THE ALJ'S RFC FINDING?

21

Plaintiff seeks reversal of the ALJ's RFC finding and requests that on remand, the ALJ reevaluate the finding at step four of the sequential evaluation, specifically, her ability to perform a full range of light work. Plaintiff argues that she cannot perform a full range of light work because of fibromyalgia, her foot neuromas and pain which prevent her from engaging in a good deal of walking or standing.

### STANDARD OF REVIEW FOR ESTABLISHING RFC.

Under the analytical scheme established by the regulations, RFC is meant to describe the claimant's physical and mental work abilities. *James v. Commissioner of Social Security*, 2011 WL 5971032, *10 (N.D.Ohio,2011). The regulations expressly provide that the responsibility for deciding a claimant's RFC rests with the ALJ when cases are decided at an administrative hearing. *Id.* (*citing Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir.2004)). The claimant's RFC is an administrative assessment of the extent to which an individual's medically determinable impairment, including any related symptoms, may cause physical or mental limitations or restrictions that may affect the claimant's capacity to do work-related physical and mental activities. *Id.* (*citing Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D.Ohio, 2009); 20 C.F.R. §§ 404.1545(a), 416.945(a); *see, Howard v. Commissioner of Social Security*, 276 F.3d 235, 239 (6th Cir.2002)).

"Ordinarily, residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. POLICY INTERPRETATION RULING TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8p, 1996 WL 374184, *1 (July 2, 1996)). A 'regular and continuing basis' means eight hours a day, for five days a week, or an equivalent work schedule." *Id.*

### APPLICATION OF THE STANDARD OF REVIEW TO THE FACTS IN PLAINTIFF'S CASE.

In the present case, the ALJ stated that the RFC determination was based on a history of foot

neuromas and bunions.  The ALJ even considered that Plaintiff had fibromyalgia in the absence of measurable signs and symptoms.  Plaintiff does not make a persuasive argument that she was more limited than found in the RFC considering that the ALJ referred to her fibromyalgia as well as her own representations to Dr. Vandehey that the problems arising from her foot maladies, except for the pain, had been resolved with surgery and anti-inflammatory medications (Docket No. 11, p. 27 of 882).  The reasonable limitations associated with ongoing foot pain and fibromyalgia were addressed in the RFC.  Thus, the ALJ followed the regulations, considering Plaintiff's testimony to the extent that it was consistent with the medical evidence, noting that the allegations of functional disability had no clinical or treating source support and noting that the physicians that treated her for symptoms of fibromyalgia and/or foot pain had not assessed her with limitations that would prevent her from standing or walking while employed.

**DID THE ALJ IMPROPERLY REJECT THE OPINIONS OF DR. TORELLO AND DR. MILLER AND SUBSTITUTE HER LAY OPINION IN ASSESSING PLAINTIFF'S RFC?**

As to the second component of Plaintiff's argument regarding RFC, she contends that the ALJ improperly rejected the opinions of Dr. Torello and Dr. Miller and substituted her lay opinion in assessing Plaintiff's RFC.  Plaintiff seeks remand to permit:  (1) Dr. Torello to consider the entire period prior to the DLI and render a decision as to RFC and (2) Dr. Miller to clarify Plaintiff's RFC prior to the expiration of the DLI.

In addressing Plaintiff's first issue, the Magistrate stated that the ALJ considered and rejected Dr. Torello's RFC assessment that Plaintiff could perform medium work and assigned Plaintiff a more favorable RFC assessment for light work.  In making this assessment, the ALJ stated that she was giving Plaintiff the benefit of the doubt in view of her occasional foot pain.  For all the reasons previously set forth, seeking additional information or recontacting Dr. Torello as suggested by

23

Plaintiff would not provide additional objective evidence of Plaintiff's medical status during the relevant period and therefore would not provide a basis for the ALJ to reconsider her RFC finding.

Plaintiff also argues that this case should be remanded to seek additional medical opinions from Dr. Miller, a treating physician.  This request lacks merit inasmuch as Dr. Miller's treatment notes reflect that she started treating Plaintiff in 2008 after Plaintiff's last date insured.  Consequently, Dr. Miller's opinion on Plaintiff's condition prior to commencement of their doctor-patient relationship would be speculative.  The ALJ gave legitimate reasons for rejecting the opinions of Drs. Torello and Miller.  Furthermore, the regulations expressly provide that it is the ALJ's responsibility to decide a claimant's RFC when cases are decided at the administrative level.  The Magistrate finds that no basis exists for remanding this case to the Commissioner to recontact Dr. Torello and/or Dr. Miller.

### 2.  DID THE ALJ FAIL TO PROPERLY ANALYZE AND CONSIDER THE IMPACT OF PLAINTIFF'S OBESITY?

At the time Plaintiff completed her DISABILITY REPORT-ADULT, she was 5'3", weighed 187 pounds and had a body mass index (BMI) of 33.1.  Plaintiff argues that the ALJ did not properly evaluate or specifically state the impact of obesity on her impairment.  Consequently the ALJ's decision denying her benefits should be reversed as required under SSR 02-1p, POLICY INTERPRETATION RULING TITLES II AND XVI:  EVALUATION OF OBESITY, 2000 WL 628049 (May 15, 2000).

Obesity, as defined in SSR 02–1p, "is a complex, chronic disease characterized by excessive accumulation of body fat."  S.S.R. 02–1, INTRODUCTION, 2000 WL 628049, at *1.  The Social Security Administration (SSA) considers obesity to be a medically determinable impairment.  *Id.* at *1.  In fact, obesity was considered an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), but in 1999 the SSA deleted that listing.  Now the SSA has added paragraphs to the prefaces of body system listings that provide direction for considering the potential effects obesity may have

24

in causing or contributing to impairments in those body systems.  *Id*. at *3.

The National Institutes of Health has established guidelines for classification of overweight and obese adults in its *Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults*.  *Id*. at *4.  These guidelines classify an overweight or obese individual based on the ratio of an individual's weight in kilograms to the square of his or her height in meters or that person's BMI.  *Id.* at *4, fn.6.  An adult with a BMI of 30.0 or above is considered "obese."  *Id*. Obesity is further divided by the *Clinical Guidelines* into three levels:

1.  Level I (BMI of 30.0–34.9)
2.  Level II (BMI of 35.0–39.9);
3.  Level III (BMI greater than or equal to 40.0–extreme obesity).

*Id*.  Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems, and commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems.  *Id.* at *6.  Therefore, the SSA provides that it "will consider obesity in determining whether:

1.  The individual has a medically determinable impairment.
2.  The individual's impairment(s) is severe.
3.  The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings.
4.  The individual's impairment(s) prevents him or her from doing past relevant work and

other work that exists in significant numbers in the national economy.

*Id*. at *7.

When establishing the existence of obesity, the SSA will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height. *Id.* at *8.  The SSA will also, "in the absence of evidence to the contrary in the case record,  accept a diagnosis of obesity given by a treating source or by a consultative examiner."  *Id.* at *8–*9.  In the event that no diagnosis of obesity is contained within the record, SSR 02–1p provides

25

that the SSA "may ask a medical source to clarify whether the individual has obesity" or may elect to use its own judgment in making this determination. *Id.* at *9. The ability of the SSA to use its judgment to establish the presence of obesity pursuant to SSR 02–1p, however, is only available "when the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI . . . " *Id.* at *9.

Prior to the DLI there is substantial evidence that Plaintiff was 5'4" and her weight vacillated between 140 to 150 pounds. Immediately before the expiration of the date insured, Plaintiff's weight increased to 168 pounds. Relying on what transpired before the expiration of the DLI, the ALJ did not expressly consider Plaintiff's weight and its effect on her other impairments because none of her treating physicians make explicit references in their assessments or observations about long-term excess weight or extreme BMI during this time. Neither was obesity implicitly raised in the report of other symptoms.

The Magistrate finds that under the regulations, it is appropriate to rely on the ALJ's use of her judgment in establishing the existence of obesity. In the absence of evidence from physicians who have examined Plaintiff and reported her weight and height, there are few medical records showing consistently high body weight or BMI prior to the expiration of the DLI.

3. **DID THE ALJ ACCURATELY EVALUATE PLAINTIFF'S PAIN?**

Plaintiff takes issue with the ALJ's pain analysis on two bases. First, the ALJ failed to consider that the symptoms associated with fibromyalgia and bilateral neuromas were greater than the RFC. Second, the ALJ failed to consider the type, dosage, effectiveness, side effects and contraindications of any medications as required by 20 C. F. R. § 404.1529. Plaintiff contends that this flaw is fatal to the decision.

26

**THE STANDARD FOR ADJUDGING PAIN AS A CAUSE OF DISABILITY.**

A claimant's subjective statements concerning her symptoms are not enough to establish disability. *Brewer v. Astrue,* 2012 WL 262632, *9 (N.D.Ohio,2012) (*See* SSR 96–7p, Introduction). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *Id.* First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. *Id.* Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." *Id.* (*see Siterlet v Secretary of Health and Human Services,* 823 F. 2d 918, 920 (6th Cir. 1987)).

**FIBROMYALAGIA AND PAIN ANALYSIS.**

Fibromyalgia is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least three months.  TITLES II AND XVI:  EVALUATION OF FIBROMYALGIA, SSR 12-2p; 2012 WL 3104869, * 2 (July 25, 2012).

> When a person seeks disability benefits due in whole or in part to fibromyalgia, we must properly consider the person's symptoms when we decide whether the person has a medically determinable impairment of fibromyalgia.  As with any claim for disability benefits, before we find that a person with a medically determinable impairment of fibromyalgia is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity. In this Ruling, we describe the evidence we need to establish a medically determinable impairment (MDI) of FM and explain how we evaluate this impairment when we determine whether the person is disabled.  *Id.*

At step two of the sequential evaluation process, an analysis will ensue as to whether the MDI could be reasonably expected to produce pain or other symptoms that person alleges. *Id.*  Then we will consider those symptoms in deciding whether the person's impairments are severe. *Id.*  If the person's pain or other symptoms cause a limitation or restriction that has more than a minimal effect on the ability to perform basic work activities, then we will find that the person has a severe impairment. *Id.*

27

There was minimal objective medical evidence to confirm the alleged severity of pain brought about by the symptoms of fibromyalgia.  Nevertheless, the ALJ considered both prongs of the test. First, she found that it was not a medically determinable impairment.  This determination hinged on the assessment of the condition by medical professionals and Plaintiff's own statements.  Few medical professionals referred to the diagnosis of fibromyalgia and none of them documented tender points or sensory deficits resulting from the pain.  The medical evidence neither documented the severity of the alleged pain nor showed that Plaintiff's medical condition was of such severity that the alleged pain could be reasonably expected to occur (Docket No. 11, pp. 25, 26 of 882).  Referring to the Plaintiff's own statements about the intensity and persistence of the symptoms, it was evident that the onset of symptoms was intermittent and the pain was controlled with medication.

Second, the ALJ conducted a review of Plaintiff's symptoms of fibromyalgia, presuming that they could reasonably be expected to cause the alleged symptoms of pain.  Again, based on the medical evidence and Plaintiff's assertions, there were insufficient factors arising from the symptoms of fibromyalgia that affected her ability to perform a wide range of activities (Docket No. 11, pp. 27-28 of 882).

Having followed the rules and regulations for assessing pain, the findings that Plaintiff was not disabled by fibromyalgia or the pain it causes, will not be disturbed as it is supported by the evidence. There is no evidence that the symptoms associated with fibromyalgia were greater than the ALJ's RFC determination.

28

### NEUROMAS AND PAIN ANALYSIS.

The ALJ conducted a similar analysis for Plaintiff's foot pain.  She identified the two pronged test for purposes of analyzing the severity of Plaintiff's foot pain and even found that Plaintiff's foot pain was a medically determinable impairment that could be reasonably expected to produce pain or other symptoms (Docket No. 11, pp. 28-29 of 882).  When determining RFC, the ALJ considered that Plaintiff's foot impairments resulted in some limitation in lifting, walking and standing.  The ALJ discounted the notion that the foot pain caused a limitation or restriction that had more than a minimal effect on the ability to perform basic work activities because by her own admission, Plaintiff suffered minimal limitations as a result of her painful neuromas and bunions of her feet.  The Magistrate is persuaded that the ALJ properly evaluated Plaintiff's foot pain.

### MEDICATION ANALYSIS ON COMPLAINTS OF PAIN.

If the claimant's subjective claims of pain are not substantiated by the medical record, then ALJ must make a credibility determination of the individual's statements based on the entire case record. *Brewer, supra,* 2012 WL 262632 at *9.  Though credibility determinations regarding a claimant's subjective complaints rest with the ALJ, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." *Id.  (citing* SSR 96–7p, Purpose section; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross v. Commissioner*, 373 F.Supp.2d 724, 733 (N.D.Ohio 2006) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the

29

court to "trace the path of the ALJ's reasoning.")

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *Id.* (*See* SSR 96–7p, Purpose). Beyond medical evidence, there are seven factors that the ALJ should consider: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) **the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms**; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *Id.* (*citing* SSR 96–7p, Introduction; *see also Cross, supra*, 375 F.Supp. at 732). It is well established that an ALJ need not analyze all seven factors, but should show that he or she considered the relevant evidence. *Id.* (*See Cross, supra*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D.Wis.2005)).

FIBROMYALGIA AND CREDIBILITY REVIEW.

Since the ALJ acknowledged that the fibromyalgia was not substantiated by the record, the ALJ was required to determine credibility. The ALJ gave specific reasons for the finding on credibility, supported by evidence in the case record, and made it clear the weight she gave to the evidence and the reasons for the weight. While she did not analyze all seven factors, the ALJ did analyze those that were material to the credibility analysis. The ALJ considered Plaintiff's daily activities (Docket No. 11, p. 26 of 882); the location, duration, frequency, and intensity of her pain; the fact that she took pain medication to alleviate the symptoms and the change of seasons precipitated and aggravated her

30

symptoms and that Plaintiff was not undergoing treatment at that time  (Docket No. 11, p. 25 of 882).
The ALJ did not consider side effects from the pain medication as the medical records do not document
any side effects.

The ALJ followed the rules and made a credibility determination, including Plaintiff use of
medication.  Since her findings are substantiated by the medical record, the Magistrate will not disturb
them.

### NEUROMAS AND CREDIBILITY REVIEW.

Because the ALJ considered the applicable medical evidence for Plaintiff's foot impairment
and articulated a reasoned explanation for her finding that the impairment was substantiated by the
medical record, she clearly was persuaded that Plaintiff's neuromas were a medically determinable
impairment.  Under the rules, the ALJ was not required to go beyond medical evidence and consider
the type, dosage, effectiveness, and side effects of any medication Plaintiff took to alleviate pain or
other symptoms because Plaintiff's credibility was not issue.

## XI.  CONCLUSION

For these reasons, the Magistrate recommends that the Court affirm the Commissioner's
decision and terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   March 19, 2013

## XII.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached
hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO,

31

any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.

32